IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES JONES, II and : 
DONALD F. TOOLE, : 
                   : 
         Plaintiffs, : 
      v. :     3:18-CV-1919
                   :     (JUDGE MARIANI)
PITTSTON AREA SCHOOL : 
DISTRICT, : 
                   : 
         Defendant. : 

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiffs Charles Jones, II and Donald F. Toole initiated this § 1983 action on

October 2, 2018, each asserting a claim of "First Amendment patronage/free speech & free

association" against Defendant Pittston Area School District.  (Doc. 1).  Presently before the

Court is Defendant's Motion for Summary Judgment (Doc. 20).  For the reasons that follow,

Defendant's Motion will be granted.

### II. STATEMENT OF UNDISPUTED FACTS

Defendant has submitted a Statement of Material Facts in Support of its Motion for

Summary Judgment (Doc. 21) as to which it submits there is no genuine issue or dispute for

trial.  Plaintiff has submitted an "Answer to Defendants [sic] Statement of Material Facts in

Support of Defendant's Motion for Summary Judgment" (Doc. 26) and the following facts have been admitted.[1]

### 1. School Security Officers

Defendant Pittston Area School District maintains three categories of school security officers: full-time, part-time, and substitute.  (Doc. 21 at ¶ 6).  Substitute security officers fill in for fill-time or part time security guards if they are unavailable for sporting events or extracurricular activities.  (*Id*. at ¶ 7).

In May of 2017, Defendant employed five fill-time security officers: Dennis O'Brien, John Hindmarsh, Colleen McAndrew, Pat Lello, and Nick Chiumento, as well as two part-time security officers: Amy Jadus and Rick Romanko.  (*Id*. at ¶ 8).  At that time, Defendant also kept a list containing the names of eight or more substitute security officers.  (*Id*. at ¶ 9).

Plaintiffs Charles Jones, II and Donald Toole were both utilized as substitute security officers by Defendant before and during May of 2017.  (*Id*. at ¶ 1).  Jones began working for Defendant in September of 2008 as a substitute security guard.  (*Id*. at ¶ 4).  Toole cannot remember the exact date he began working as a substitute security guard.  (*Id*. at ¶ 5).

---

[1] Facts deemed undisputed include those which Plaintiffs admitted from Defendant's Statement of Undisputed Material Facts.  Statements that Plaintiffs admitted in part or were admitted with a qualification are only included in this section to the extent they were admitted.

To the extent that denials do not have a basis for denial in the record or merely disagree with a statement in an individual's properly quoted testimony, the Court will deem those asserted facts as admitted, and, where relevant, has included them in the statement of undisputed facts.

Michael Boone, who is currently the Director of Security, began working as a school police officer for Defendant in 2014 after retiring from the Pennsylvania State Police. (*Id*. at ¶ 3). As Defendant's Director of Security, Boone was responsible for the utilization of substitute security officers in May 2017 and thereafter. (*Id*. at ¶ 10). In this role, Boone assigned work to Jones and Toole in 2017 as needed. (*Id*. at ¶ 11). When they were needed, Jones and Toole would receive either a phone call or text message from Boone to see if they were available for work. (*Id*. at ¶ 13). Jones and Toole both did not have a set schedule, and they were never guaranteed a particular shift or hours by Defendant. (*Id*. at ¶ 12).

### 2. The Pittston Area School Board Primary Election

The Pittston Area School District held a primary election to fill school board positions on May 16, 2017. (*Id*. at ¶ 14). Jones and Toole each stated that they supported Dr. Lori Cooper as a candidate during the primary election cycle. (*Id*. at ¶ 15).

Jones stated that he showed his support for Dr. Cooper by displaying signs throughout the Pittston, Pennsylvania area beginning in April 2017 and by attending committee formation meetings. (*Id*. at ¶ 16). Toole stated that he showed his support for Dr. Cooper by picking up materials for his wife and son to create signs for Dr. Cooper, as well as by attending a campaign committee formation meeting in January of 2017. (*Id*. at ¶ 18). Toole also stated that he displayed two signs in Support of Dr. Cooper in his yard. (*Id*.

3

at ¶ 18).  Dr. Cooper was ultimately successful in the May 2017 primary and she went on to win in the November 2017 general election.  (*Id*. at ¶ 21).

Jones and Toole both worked shifts for the District throughout the primary election cycle.  (*Id*. at ¶ 20).  Jones and Toole both stated that they were not reprimanded, nor did they have their pay reduced by the District for supporting Dr. Cooper during the primary election cycle.  (*Id*. at ¶ 19).

On May 16, 2017, the day of the primary election, Boone sent text messages to Jones and Toole asking if they could work that evening.  (*Id*. at ¶ 22).  Jones declined because he was scheduled to work the primary election polls that night, but Toole was available.  (*Id*).  Boone sent Jones another text message on May 16, 2017 asking Jones if he would work a shift the following day, to which Jones agreed.  (*Id*. at ¶ 23).  The following day, Boone sent Toole text messages asking him to work on May 18, 2017 and May 20, 2017, but Toole was unavailable both days.  (*Id*. at ¶ 24).

### 3. Post-School Board Primary Election

Jones stated that he attended a school board meeting in June 2017.  (*Id*. ¶ at 29).  Jones stated that, at the meeting, Boone approached him, shook his hand, and stated that Jones "did a wonderful job for him and that it was not him, that it was political why I wasn't -

4

- you know, it was politics that he couldn't call me back, he was told not to call me back."[2]

(*Id.* at ¶ 30).

Toole underwent heart surgery on July 17, 2017. (*Id.* at ¶ 41). Toole could not return to work following his heart surgery for six weeks. (*Id.* at ¶ 42). On August 15, 2017, Toole received a test message from Boone regarding his medical condition. (*Id.* at ¶ 43). Boone stated that, the last time he heard from Toole, Toole told him that the doctor did not want him working and he was unable to work. (*Id.* at ¶ 44). Boone never received a medical clearance clearing Toole to return to work. (*Id.* at ¶ 45).

Plaintiffs both stated that security officers Amy Jadus, John Hindmarsh, Ronald Walsh, and Frank Licata all "know[ ] the[ir] firing was political." (*Id.* at ¶ 25). Plaintiffs also stated that Boone and Dennis O'Brien "told Plaintiff's [sic] firing was political." (*Id.* at ¶ 26).

Jones testified that Defendant knew he supported Dr. Cooper during the primary election cycle based on "talking, referring back" by other security officers, namely O'Brien, Jadus, Licata, Ron Ostroski, and Hindmarsh. (*Id.* at ¶ 28). Jones stated that security officer Jadus knows his firing was political, which Jones learned by "[t]alking to other coworkers and stuff like that," but Jones was never told that directly by Jadus. (*Id.* at ¶ 33). Jones also stated that Walsh, who is his uncle and a security guard with Defendant, knows his firing was political, which Walsh learned by "being around the school and talking to other

_____

[2] The parties do not dispute that Jones testified in this manner during his deposition. However, it is important to note that the parties do dispute the content of his testimony.

coworkers." (*Id*. at ¶ 35).  Jones further stated that security officer Licata knows his firing was political since Licata's "wife [Dawn Licata] [is] - - Kevin Booth, the superintendent, she was the secretary there, and talking to coworkers." (*Id*. at ¶ 36).

Toole stated that he was informed by security officers O'Brien, Hindmarsh, and "several people" that they heard his District employment was terminated. (*Id*. at ¶ 46). Toole also stated that at the second football game of the 2017 season, Boone approached him and said "you did a great job for me, but - - he said, I have nothing to do with this, he said, it's strictly political." (*Id*. at ¶ 47).  Toole further stated that security officer Jadus knew that his firing was political, but this was "hearsay that [Toole] heard from one of the other security guards." (*Id*. at ¶ 50).  Toole also stated that Walsh knew that Toole's firing was political because he "spoke with . . . the other security guards and were told by them." (*Id*. at ¶ 52).  Toole stated that Licata knew that Toole's firing was political because Licata's "wife [Dawn Licata] is the personal secretary to the superintendent and I'm - - I'm sure they had conversations about it." (*Id*. at ¶ 53).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts.  Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial.  The mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no *genuine* issue of *material* fact.
> When opposing parties tell two different stories, one of which is blatantly
> contradicted by the record, so that no reasonable jury could believe it, a court
> should not adopt that version of the facts for purposes of ruling on a motion for
> summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make

credibility determinations or engage in any weighing of evidence."  *Anderson*, 477 U.S. at

255.  Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may

be in issue, or when conflicting evidence must be weighed, a full trial is necessary.[3]

---

[3] *See Guidotti v. Legal Helps Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013):
Under Rule 56, . . . a "court shall grant summary judgment if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment as a matter
of law." Fed.R.Civ.P. 56(a). The party asserting that there is a genuine dispute of material fact
must support that assertion by "citing to particular parts of ... the record, including depositions,
documents, electronically stored information, affidavits or declarations, stipulations...,
admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A). In evaluating
the motion, "the court must draw all reasonable inferences in favor of the nonmoving party,
and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson
Plumbing Prods., Inc.*, U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

716 F.3d at 772.  *See also, Doebblers' Penn. Hybrids, Inc. v. Doebbler*, 442 F.3d 812, 820 (3d Cir.
2006)(stating that credibility determinations "are inappropriate to the legal conclusions necessary to a ruling
on summary judgment. . . .A District Court should not weigh the evidence and determine the truth itself, but
should instead determine whether there is a genuine issue for trial."); *J.F. Feeser, Inc v. Serv-A-Portion,*

## IV. ANALYSIS

In the present Motion for Summary Judgment, Defendant first argues, citing to

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), that as the sole

Defendant named in this action, "the District cannot be held liable for the acts of its

employees under a respondeat superior theory on Plaintiffs' 42 U.S.C. § 1983 claims."

(Defendant's Brief in Support of its Motion for Summary Judgment, Doc. 22 at 13).

Plaintiffs' claimed constitutional deprivations are brought under 42 U.S.C. § 1983

which states in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C.A. § 1983.  To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that

"(1) ... the conduct complained of was committed by a person acting under color of state law

and (2) ... [that] the conduct deprived the complainant of rights secured under the

Constitution or federal law." *Sameric Corp. v. City of Philadelphia,* 142 F.3d 582, 590 (3d

Cir.1988).

A municipality or other local government entity is a "person" for purposes of § 1983.

*Bd. Of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997)

---

*Inc.*, 909 F.2d. 1254, 1531 (3d Cir. 1990) ("We are keenly aware that credibility determinations are not the
function of the Judge; instead the non-movant's evidence must be credited at this stage.").

(citing *Monell*, 436 U.S. at 689).  However, when a plaintiff alleges that a local government

is responsible for the deprivation of a constitutional right by its employee, he must satisfy

the requirements identified in *Monell.*  In *Monell*, the Supreme Court recognized that while

local government units can be made liable under § 1983, "a municipality cannot be held

liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.  Thus, a

local government cannot be held liable for "an injury inflicted solely by its employees or

agents." *Id.* at 694.  Liability exists only where the "execution of a government's policy or

custom...inflicts the injury." *Id.*

The Third Circuit has clarified that a municipality can be held liable for the acts of its

employees in one of three ways:

> (1) the individual acted pursuant to a formal government policy or a standard
> operating procedure long accepted within the government entity, (2) the
> individual himself has final policy-making authority such that his conduct
> represents official policy, or (3) a final policy-maker renders the individual's
> conduct official for liability purposes by having delegated to him authority to act
> or speak for the government, or by ratifying the conduct or speech after it has
> occurred.

*Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006).

Here, Defendant specifically argues that Plaintiffs are unable to establish *Monell*

liability under any of the three ways outlined above, claiming that (1) there is no evidence

that the District had a policy or custom of not utilizing substitute security officers in

retaliation for their alleged political affiliation, (2) Boone, who was responsible for deciding

which security guards to utilize, is not a final policymaker under Pennsylvania law, and (3)

10

there is no evidence of record that the school board or Superintendent Booth, who

Defendant claims are the District's final policymakers, approved of Boone's decision not to

utilize Plaintiffs as security officers. (*See* Doc. 22 at 6–11).  The Court will address each

potential basis for *Monell* liability in turn.

### 1. Formal Government Policy or Operating Procedure

First, "the municipality will be liable if its employee acted pursuant to a formal

government policy or a standard operating procedure long accepted within the government

entity." *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (citing *Jett v. Dallas*

*Independent School District*, 491 U.S. 701, 737 (1989)).  Plaintiffs make no suggestion that

Defendant has any express policy or operating procedure of retaliating against District

security officers, or any other District employees, based on their support of certain political

candidates.  Instead, in opposition to Defendant's Motion Plaintiffs argue that "the

established 'custom' was that Boone made any and all scheduling decisions with respect to

Jones and Toole.  The plaintiff is not required to prove that the custom had the District's

formal approval."  (Plaintiffs' Brief in Opposition to Defendant's Motion for Summary

Judgment, Doc. 27 at 7–8).

However, Plaintiffs misunderstand the type of custom necessary to establish

municipal liability under § 1983.  To establish *Monell* liability through this avenue, the record

must demonstrate that the municipal official acted in accordance with an official custom or

policy of unconstitutional conduct.  *See e.g., Monell*, 436 U.S. at 694–95, 661, n. 2. (finding

municipal liability under § 1983 was implicated where "[t]he plaintiffs alleged that New York had a citywide policy of forcing women to take maternity leave after the fifth month of pregnancy unless a city physician and the head of an employee's agency allowed up to an additional two months of work").  In the context of this case, to establish *Monell* liability for the First Amendment political patronage claims that Plaintiffs have alleged, the record would need to demonstrate that the Defendant has a formal custom of routinely retaliating against its security officers for supporting a certain political candidate, particularly in the form of loss of work.  Plaintiffs instead assert that Defendant had an established custom "that Boone made any and all scheduling decisions with respect to Jones and Toole," without any reference to unconstitutional conduct.

Assuming, arguendo, that Plaintiffs correctly asserted that Boone was acting in accordance with Defendant's established custom of unconstitutional conduct when making scheduling decisions, the evidence record would not support *Monell* liability on this basis. Where there is no express policy on the pertinent issue and the plaintiff is therefore attempting to prove that one official's misconduct was not an isolated occurrence, allegations of a single act of constitutional violation does not show a custom or policy.  *See*, *e.g.*, *Doby v. DeCrescenzo*, 171 F.3d 858, 868 (3d Cir. 1999) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990)).  As summarized in *Brown v. Pittsburgh*, 586 F.3d 263 (3d Cir. 2009),

the Supreme Court has explained [that], "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing ... municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion). The rationale for this rule is straightforward. "[A] single incident of police misbehavior by a single policeman is insufficient as sole support for an inference that a municipal policy or custom caused the incident." *Id*. at 832, 105 S.Ct. 2427 (Brennan, J., concurring); *see id*. at 822–24, 105 S.Ct. 2427 (plurality opinion) (contrasting the facially unconstitutional, explicit policy at issue in *Monell*, only one application of which was sufficient to trigger municipal liability, to fact patterns that present no such explicit policy, where "more proof than the single incident will be necessary" to establish a causal connection between the incident and some municipal policy); *see also Monell*, 436 U.S. at 691, 98 S.Ct. 2018 (explaining that municipal liability can exist even when "discriminatory practices" are "not authorized by written law," but only if such practices are sufficiently "permanent and well settled as to constitute a 'custom or usage' with the force of law" (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970))).

*Brown*, 586 F.3d at 292–93.

Here, the evidence of record does not show a genuine dispute of fact as to whether Boone's decision to no longer utilize Plaintiffs as substitute security officers for Defendant was part of a larger pattern showing retaliatory conduct by Defendant.  The record is devoid of any suggestion that Boone decided to stop calling any other substitute security officers, other than Plaintiffs, due their support of particular political candidates.  Boone's scheduling decisions regarding other security officers was not probed by Plaintiffs' counsel during the depositions of Boone and Superintendent Booth, nor were any related questions posed through the interrogatories that Plaintiff served on Defendant.  (*See* Dep. of Michael Boone;

Dep. of Kevin Booth; Def.'s Ex. E, "The District's objections and responses to plaintiffs' first

set of interrogatories").  Plaintiffs only sought to learn information related to the specific

allegations of retaliation against them contained in their Complaint.  Thus, the record does

not support *Monell* liability where there is no evidence of Boone acting in accordance with

any unconstitutional municipal custom or policy when he decided to stop scheduling

Plaintiffs as substitute security officers.

### 2. Boone is not a Policymaker

A municipality may also be liable for the unconstitutional conduct of its employee

"when the individual has policy making authority rendering his or her behavior an act of

official government policy."  *McGreevy*, 413 F.3d at 367.  When addressing which

government officials are considered to have policymaking authority under *Monell*, the

Supreme Court stated:

> [N]ot every decision by municipal officers automatically subjects the
> municipality to § 1983 liability.  Municipal liability attaches only where the
> decisionmaker possesses final authority to establish municipal policy with
> respect to the action ordered. The fact that a particular official—even a
> policymaking official—has discretion in the exercise of particular functions does
> not, without more, give rise to municipal liability based on an exercise of that
> discretion. The official must also be responsible for establishing final
> government policy respecting such activity before the municipality can be held
> liable. Authority to make municipal policy may be granted directly by a
> legislative enactment or may be delegated by an official who possesses such
> authority, and of course, whether an official had final policymaking authority is
> a question of state law. However, like other governmental entities,
> municipalities often spread policymaking authority among various officers and
> official bodies. As a result, particular officers may have authority to establish
> binding county policy respecting particular matters and to adjust that policy for

the county in changing circumstances. To hold a municipality liable for actions ordered by such officers exercising their policymaking authority is no more an application of the theory of respondeat superior than was holding the municipalities liable for the decisions of the City Councils in *Owen* and *Newport*. In each case municipal liability attached to a single decision to take unlawful action made by municipal policymakers. We hold that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84 (1986) (internal citations omitted).

Ultimately, "[i]n order to ascertain if an official has final policy-making authority, and can thus bind the municipality by his conduct, a court must determine (1) whether, as a matter of state law, the official is responsible for making policy *in the particular area* of municipal business in question . . . and (2) whether the official's authority to make policy in that area is *final and unreviewable*." *Hill*, 455 F.3d at 245–46 (3d Cir. 2006).

As to the first prong of the test, the Supreme Court has stated that a court's inquiry is guided by two principles: first, "whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue," and second, "our inquiry is dependent on an analysis of state law." *McMillian v. Monroe County*, 520 U.S. 781, 785–86 (1997). As for the state law aspect of the policymaker analysis, when addressing the role of state law in a court's final policymaker analysis, the Supreme Court has provided:

This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the actual function of a governmental official, in a

particular area, will necessarily be dependent on the definition of the official's functions under relevant state law.

*McMillian*, 520 U.S. at 786.

Here, Plaintiffs claim of retaliation centers on the fact that they were not called back to work for Defendant as substitute security officers following May of 2017 after years of being consistently placed on the schedule. (*See* Doc. 27 at 2). Thus, the particular area of municipal business in question is personnel decisions regarding Defendant's substitute security officers.

It undisputed by the parties that Boone, as a school police officer and the Director of Security from 2014 through May of 2017, was primarily responsible for scheduling the shifts of substitute security officers. (Dep. of Boone, at 6:24-25, 7:1-7, 8:7-11, 16:19-25, 17:1-13, 18:3-13). Although he would receive an occasional suggestion or request from the principal or a coach regarding who to schedule, Boone was the sole person responsible for either texting or calling Plaintiffs to ask them to work when shifts became available. (*Id*. at 17:1-13). Defendant repeatedly acknowledges throughout its brief that "Boone was responsible for deciding which security guards to utilize since May 2017," (Doc. 22 at 15), and that "the record confirms that Boone made the decision to select substitute security guards in and after May 2017," (*Id*. at 18). In addition to his control over scheduling, the record further supports a finding that Boone had discretion over other personnel decisions as to substitute security officers. As to his general supervisory authority, Boone stated during his deposition

16

that he was considered Plaintiffs' direct supervisor in terms of assigning work, and further

that "[a]s far as a supervisory role, I mean, if an incident came up, I guess I could speak with

them or they could come to me . . . and I would direct them right away.  But, I mean, they

weren't employees as far as daily supervision needed to be."  (Dep. of Boone at 12:3-8).

When asked whether he had the authority to discipline Plaintiffs, Boone stated: "I would

assume so.  I mean, as far as - - but I don't know what kind of discipline - - I mean, they

would be called in.  If they weren't performing their job, then we would call somebody else."

(*Id*. at 12:9-16).  The record therefore supports a finding that Boone, through the role of

Director of Security, had authority over the particular area of scheduling and general

personnel decisions regarding substitute security officers.

However, although Boone has discretionary authority over the personnel decision of

substitute security officers, the evidence of record and current Third Circuit precedent does

not support a finding that his authority is final and unreviewable.  Defendant argues that,

under Pennsylvania law, only the superintendent and school board are the final

policymakers regarding personnel decisions, and therefore Defendant cannot be liable for

Boone's decision to no longer utilize Plaintiffs as substitute security officers.  (Doc. 22 at

16).  Defendant supports this assertion with citation to Third Circuit precedent *Baloga v.*

*Pittston Area School District*, 927 F.3d 742 (2019).[4]

_____

[4] As to *Baloga,* Defendant claims that "the Third Circuit recently made clear that this District's policy makers with respect to employment decisions are the superintendent and/or the school board."  (Doc. 22 at

In *Baloga*, the plaintiff, a full-time custodian for the Pittston Area School District,

alleged that the District and its maintenance director retaliated against him based on his

union involvement speech.  *Baloga*, 927 F.3d at 748–49.  In determining that the record did

not support *Monell* liability for the alleged retaliatory conduct by the District's maintenance

director, the Circuit Court found that the plaintiff's "repeated invocation of Superintendent

Kevin Booth's Authority demonstrates" that the District's maintenance director "did not have

final decision-making authority and thus was not a policymaker under Pennsylvania law."

*Id*. at 761.  The Circuit Court further stated, "[t]here is also no evidence that those who do

qualify as policymakers, such as [Superintendent] Booth or the school board, knew about,

much less approved, Baloga's transfer for an allegedly unconstitutional reason or delegated

---

16).  While *Baloga* is on point with the facts presented here, it is important to note that Defendant has overstated the ruling in this case.

     The language in *Baloga* indicates that Superintendent Booth and the Pittston Area School Board are examples of municipal officials who qualify as the District's policymakers for purposes of *Monell* liability with respect to the particular area of municipal business at issue in *Baloga*: personnel decisions regarding full-time District maintenance employees.  The Third Circuit did not indicate that Superintendent Booth and the Pittston Area School Board represent an exhaustive list of the District's policymakers for all employment-related decisions in every scenario.  The Circuit Court's finding is consistent with Supreme Court's well-established approach to determining whether an individual qualifies as a final policymaker for purposes of *Monell* liability.  *See McMillian*, 520 U.S. at 785 ("the question is not whether Sheriff Tate acts for Alabama or Monroe County in some categorical, 'all or nothing' manner.  Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government *in a particular area, or on a particular issue*." (emphasis added)); *see also Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989) (a court must identify "those officials who have the power to make official policy *on a particular issue*" (emphasis added)).

     Further, the Third Circuit previously clarified in McGreevy that "[t]he fact that the Pennsylvania Code provides that the school board is the final policymaker regarding dismissal of employees does not mean that a school board action is a prerequisite for imposition of liability on the District."  McGreevy, 413 F.3d at 368.  In so holding, the Circuit Court emphasized that "[i]n order to ascertain who is a policy maker a court must determine which official had final, unreviewable discretion to make a decision or take action."  *Id*. at 369 (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir.1996)).

[the maintenance director] final policymaking authority, as needed to impute liability to the municipality." *Id.* at 761.

Similar to the District's maintenance director in *Baloga*, Boone, as Defendant's Director of Security, was under the supervision of Superintendent Booth.  When asked who his immediate supervisor was in 2017, Boone stated: "depending on the building, the administrators, the superintendent." (Dep. of Boone at 8:12-16).  As Boone had several layers of District officials above him in the employment hierarchy, there is no evidence that his discretionary authority over the assignment of substitute security officers was final and unreviewable.  While Superintendent Booth testified that he had no direct role in reviewing Boone's decision to no longer utilize Plaintiffs as substitute security officers, the record contains no suggestion that he, or the School Board, were unable to review such decision had Plaintiffs made any attempt to invoke their authority.  Therefore, in light of the Third Circuit's holding in *Baloga*, the record does not support a finding that Boone's discretionary authority over the personnel decisions regarding substitute security officers is final and unreviewable.

As Boone does not qualify as a final policymaker under *Monell*, and it is undisputed that he alone made the decision to no longer utilize Plaintiffs as substitute security officers (*see* Doc. 21 at ¶¶ 10, 39; Doc. 26 at ¶¶ 10, 39), finding Defendant liable under § 1983 for the alleged constitutional violations of Boone would be exactly the type of *respondeat*

*superior* liability that *Monell* precludes.  Thus, a *Monell* claim based on Boone's decision to no longer utilize Plaintiffs as substitute security officers fails.

### 3. No Delegation of Authority

Finally, the record does not support a finding that any District official with final policymaking authority over personnel decisions delegated such authority to Boone, nor did any policymaking official ratify his actions.

"[A] final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred." *Hill*, 455 F.3d at 245.  As discussed above, the Third Circuit has found that Superintendent Booth and the Pittston Area School Board are examples of District officials who possess final policymaking authority as to personnel decisions under *Monell.  See Baloga*, 927 F.3d at 761.  Initially, the record evidence contains no suggestion that the Pittston Area School Board or the Superintendent ever delegated final policymaking authority to Boone, nor does the evidence suggest that the School Board or Superintendent ever ratified any of his scheduling or personnel decisions regarding substitute security officers.

As to Superintendent Booth, he confirmed during his deposition that he was never a party to any discussion about the employment of Plaintiffs prior to May 1, 2017.  (Dep. of Booth at 29:1-4).  Superintendent Booth further testified that he did not discuss the employment of Plaintiffs with Boone until he was served with discovery documents in

connection with the present lawsuit. (*Id*. at 24:8-22). When asked whether he was aware of

any disciplinary actions taken against Plaintiffs during their employment as substitute

security officers, Superintendent Booth testified that "[s]ubstitutes wouldn't have disciplinary

action," and that if, for example, they did not show up when they were scheduled to work,

they simply "wouldn't be called any longer." (*Id*. at 9:17-25, 10:1-10). When asked why

there was no investigation into Plaintiffs' claims that they were terminated from their

positions for political reasons, Booth testified that "Mr. Boone is in charge with making

phone calls to the subs for security, so that's as much as an investigation as there needs to

be." (*Id*. at 28:9-17).

> As to delegation of policymaking authority, the Supreme Court has stated:

> Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker. It would also be a different matter if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware. In both those cases, the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official. But the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale. In such circumstances, the purposes of § 1983 would not be served by treating a subordinate employee's decision as if it were a reflection of municipal policy.

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988).

Based on the foregoing, it appears from his deposition testimony that Superintendent Booth was "[s]imply going along with discretionary decisions made by" Boone, and his "mere failure to investigate the basis" of Boone's discretionary decisions does not amount to a delegation of policymaking authority.  The record therefore does not support *Monell* liability based on a policymaking official's delegation of authority to Boone or ratification of his conduct.

As Pittston Area School District is the only Defendant named in this § 1983 action, and the record does not support a finding of municipal liability under any of the three bases available under *Monell*, the Court will grant summary judgment in favor of Defendant on both of Plaintiffs' § 1983 claims.

## V. CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment (Doc. 20) will be granted.  A separate Order follows.

Robert D. Mariani
United States District Judge